[No. 38531-7-II.    Division Two.    September 15, 2009.]

JANE ROE, *Appellant*, v. TELETECH CUSTOMER CARE
MANAGEMENT (COLORADO), LLC, *Respondent*.

*Michael C. Subit* and *Jillian M. Cutler* (of *Frank Freed Subit & Thomas, LLP*), for appellant.

*James M. Shore* and *Molly M. Daily* (of *Stoel Rives, LLP*), for respondent.

¶1 QUINN-BRINTNALL, J. — After TeleTech Customer Care Management, LLC, rescinded the conditional offer of em-

ployment it had made to Jane Roe[1] because she failed a preemployment drug screening test, Roe sued TeleTech, alleging wrongful termination. The trial court denied Roe's motion for summary judgment and awarded summary judgment to TeleTech. On appeal, Roe argues, as she did below, that the Washington State Medical Use of Marijuana Act (MUMA), ch. 69.51A RCW, implies a civil cause of action to sue an employer who violates MUMA's provisions. Alternatively, Roe contends that MUMA expresses a public policy favoring medical marijuana use and that TeleTech wrongfully terminated her employment when it violated this policy. Because MUMA provides only a defense to criminal prosecution for the medical use of marijuana in compliance with its provisions, the trial court did not err when it granted TeleTech's summary judgment motion and we affirm.

## FACTS

BACKGROUND FACTS

¶2 Roe sought authorization under MUMA to use medical marijuana to treat her migraine headaches.[2] Roe became a patient of Thomas Orvald, MD[3] at The Hemp and Cannabis Foundation (THCF) Medical Clinic in Bellevue, Washington. On June 26, 2006, Roe filled out a "Pain Inventory Questionnaire" at the THCF clinic and Orvald provided Roe with "Documentation of Medical Authorization to Possess Marijuana for Medical Purposes" that same day. Clerk's Papers (CP) at 261.

¶3 TeleTech describes itself as an "outsourcing company that provides a full range of front-to back-office outsourced solutions." CP at 216. TeleTech contracts with Sprint Nextel to provide telemarketing and telesales services out of its

---

[1] The appellant uses the pseudonym "Jane Roe" because the medical use of marijuana remains illegal under federal law.

[2] Roe contends that traditional prescription and over-the-counter medications failed to give her relief.

[3] Dr. Orvald is licensed to practice medicine in Washington.

customer service center in Bremerton, Washington. TeleTech has an applicant drug policy that states in part:

> TeleTech has a vital interest in ensuring a safe, healthy, and efficient working environment, and in preventing accidents and injuries resulting from the misuse of alcohol or drugs. The unlawful or improper presence or use of drugs or alcohol in the workplace presents a danger to everyone.
>
> . . . .
>
> All applicants . . . to whom TeleTech has given a conditional offer of employment, are required to submit to a pre-employment drug test and must receive a negative result as a condition of employment.
>
> . . . .
>
> Any applicant who receives a confirmed positive drug test result will be ineligible for employment with the company.

CP at 221-22. Sprint Nextel requires TeleTech to perform applicant drug screenings before assigning any individual to work at the Bremerton facility.

¶4 On October 3, 2006, TeleTech hired Roe to work as a customer service consultant in its Bremerton facility. On that date, TeleTech provided Roe with a copy of its substance abuse policy for job applicants. After learning that she would be required to submit to drug testing, Roe told TeleTech that she uses medical marijuana at home and that she had medical authorization to do so. Roe offered to provide TeleTech with her medical marijuana authorization, but TeleTech declined.

¶5 On October 5, 2006, Roe took a drug test administered by ChoicePoint Workplace Solutions. On October 10, 2006, Roe began working for TeleTech and TeleTech provided Roe a copy of its substance abuse policy for employees. Roe's drug test results also came back on October 10, 2006. When Roe tested positive for marijuana, Mary Ann Peltier, a ChoicePoint supervisor, wrote Llibertat Ros, a TeleTech talent acquisition specialist, to inquire about TeleTech's medical marijuana policy.

¶6 Ros contacted supervisors at corporate headquarters, who informed Ros that TeleTech does not make an excep-

tion to its drug policies for medical marijuana use. On October 18, 2006, TeleTech terminated Roe's employment because of her positive drug screening.

PROCEDURAL FACTS

¶7 On February 13, 2007, Roe filed this action in the Kitsap County Superior Court. Roe filed an amended complaint on February 26, 2007, seeking reinstatement and damages against TeleTech for wrongful termination in violation of public policy and in violation of MUMA. On March 27, 2007, TeleTech removed the case to the United States District Court for the Western District of Washington, claiming the amount in controversy exceeded $75,000. On June 6, 2007, the federal district court granted Roe's motion to remand the case to the Kitsap County Superior Court.

¶8 On November 16, 2007, the parties submitted cross-motions for summary judgment. The trial court heard oral arguments on December 14, 2007, and, on February 1, 2008, it granted TeleTech's motion for summary judgment.

¶9 On February 27, 2008, Roe filed a notice of appeal to our Supreme Court. Our Supreme Court transferred Roe's appeal to this court on November 5, 2008.

¶10 The issue we must decide in this appeal is whether Washington voters intended MUMA to create employment protections by requiring employers to hire and retain employees who use medical marijuana outside of the workplace and, thus, intended MUMA to prohibit TeleTech from enforcing its drug-free work policy.

## ANALYSIS

¶11 Roe asserts that MUMA creates an implied cause of action against employers who terminate, or fail to hire, a person based solely on her use of medical marijuana in accordance with MUMA. Roe alternatively argues that TeleTech terminated her employment in violation of the public policy favoring the medical use of marijuana ex-

pressed in MUMA. Because MUMA neither implies a private right of action nor expresses a public policy to establish a cause of action for wrongful termination of employment, we affirm the superior court's grant of summary judgment in favor of TeleTech.

STANDARD OF REVIEW

¶12 We review a grant of summary judgment de novo, engaging in the same inquiry as the trial court. *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 206, 11 P.3d 762, 27 P.3d 608 (2000). Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Amalgamated Transit*, 142 Wn.2d at 206.

MEDICAL USE OF MARIJUANA ACT

¶13 In November 1998, the citizens of Washington enacted Initiative Measure No. 692, MUMA. MUMA is codified in chapter 69.51A RCW. Former RCW 69.51A.005 (1999), at issue here, states the purpose and intent of MUMA:

> The people of Washington state find that some patients with terminal or debilitating illnesses, under their physician's care, may benefit from the medical use of marijuana. Some of the illnesses for which marijuana appears to be beneficial include chemotherapy-related nausea and vomiting in cancer patients; [acquired immune deficiency syndrome] wasting syndrome; severe muscle spasms associated with multiple sclerosis and other spasticity disorders; epilepsy; acute or chronic glaucoma; and some forms of intractable pain.
>
> The people find that humanitarian compassion necessitates that the decision to authorize the medical use of marijuana by patients with terminal or debilitating illnesses is a personal, individual decision, based upon their physician's professional medical judgment and discretion.
>
> Therefore, The people of the state of Washington intend that:
>
> Qualifying patients with terminal or debilitating illnesses who, in the judgment of their physicians, would benefit from

the medical use of marijuana, shall not be found guilty of a crime under state law for their possession and limited use of marijuana;

Persons who act as primary caregivers to such patients shall also not be found guilty of a crime under state law for assisting with the medical use of marijuana; and

Physicians also be excepted from liability and prosecution for the authorization of marijuana use to qualifying patients for whom, in the physician's professional judgment, medical marijuana may prove beneficial.

IMPLIED PRIVATE RIGHT OF ACTION UNDER MUMA

¶14 Roe first argues that the trial court erred when it granted summary judgment in favor of TeleTech because MUMA created a private right of action for a qualifying patient to sue an employer for wrongful termination when based solely on the employee's at-home medical marijuana use in accordance with MUMA. Roe concedes that MUMA does not explicitly create a cause of action but argues that MUMA implies a private cause of action. TeleTech counters that MUMA created an affirmative defense to state criminal prosecution for possessing or manufacturing marijuana only. We agree with TeleTech.

¶15 " 'It has long been recognized that a legislative enactment may be the foundation of a right of action.' " *Bennett v. Hardy*, 113 Wn.2d 912, 919, 784 P.2d 1258 (1990) (quoting *McNeal v. Allen*, 95 Wn.2d 265, 274, 621 P.2d 1285 (1980) (Brachtenbach, J., dissenting)). We assume that the legislature is aware of the doctrine of implied causes of action and that it would not enact a remedial statute granting rights to an identifiable class without enabling members of that class to enforce those rights. *Bennett*, 113 Wn.2d at 919-20.

"When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the

provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action."

*Bennett*, 113 Wn.2d at 920 (quoting RESTATEMENT (SECOND) OF TORTS § 874A (1979)).

¶16 Borrowing from the test used by federal courts, our Supreme Court has fashioned a three-part analysis to determine if a statute implies a private right of action. In order for Roe to prevail on her claim that MUMA created a private right of action, we must find that (1) Roe is within the class for whose "especial" benefit MUMA was enacted; (2) the voters intended, explicitly or implicitly, to create a remedy; and (3) implying a remedy is consistent with the underlying purpose of MUMA. *Bennett,* 113 Wn.2d at 920-21. We hold that by enacting MUMA, the voters did not intend, explicitly or implicitly, to create a civil cause of action and MUMA does not imply a private right of action.

¶17 We interpret voter initiatives according to the general rules of statutory construction. *City of Spokane v. Taxpayers of City of Spokane*, 111 Wn.2d 91, 97, 758 P.2d 480 (1988). Statutory language must be given its usual and ordinary meaning, regardless of the policy behind the enactment. *Dep't of Revenue v. Hoppe*, 82 Wn.2d 549, 552, 512 P.2d 1094 (1973). When interpreting an initiative, we focus on "the voters' intent and the language of the initiative 'as the average informed lay voter would read it.' " *Taxpayers*, 111 Wn.2d at 97 (internal quotation mark omitted) (quoting *Estate of Turner v. Dep't of Revenue*, 106 Wn.2d 649, 654, 724 P.2d 1013 (1986)). The intent behind the language of an initiative becomes relevant only if the language is ambiguous. *Taxpayers*, 111 Wn.2d at 98. An ambiguity exists when the language of the enactment is susceptible to more than one reasonable interpretation. *State v. Thorne*, 129 Wn.2d 736, 763 n.6, 921 P.2d 514 (1996). Where there is an ambiguity in a voter initiative, we look to extrinsic aids, such as statements in the voters' pamphlet, to determine the voters' intent. *Amalgamated Transit*, 142 Wn.2d at 205-06.

¶18 Roe points to three provisions to support her argument that voters intended to create a civil remedy under MUMA for medical marijuana users. She first argues that MUMA's preamble, codified at former RCW 69-.51A.005, demonstrates that Washington voters "intended the law to do much more than just protect qualifying patients from criminal prosecution." Br. of Appellant at 14. MUMA's preamble expresses the broad purpose of allowing physicians to "authorize the medical use of marijuana by patients with terminal or debilitating illnesses." Former RCW 69.51A.005. But the preamble also explicitly expresses MUMA's intent that "[q]ualifying patients . . . shall not be found guilty of a crime under state law for their possession and limited use of marijuana" and that physicians "be excepted from liability and prosecution for the authorization of marijuana use to qualifying patients." Former RCW 69.51A.005. The average informed lay voter would understand from reading MUMA's preamble that it was intended to address one subject—criminal prosecutions, from a physician's decision to recommend, and a patient's decision to use, marijuana as treatment for a terminal or debilitating illness. Although employer drug policies may also present an obstacle to a qualified patient's decision to use medical marijuana, the plain language of MUMA's preamble does not demonstrate any intent to address employers' hiring practices, nor does it preclude the operation of drug-free businesses.

¶19 Next, Roe argues that former RCW 69.51A.040(1) implies a civil remedy because it explicitly prohibits the denial of "any right or privilege" to qualified patients using medical marijuana in accordance with MUMA. But Roe reads only the second sentence and takes it out of context. In its entirety former RCW 69.51A.040(1) states:

> If charged with a violation of state law relating to marijuana, any qualifying patient who is engaged in the medical use of marijuana, or any designated primary caregiver who assists a qualifying patient in the medical use of marijuana, will be deemed to have established an affirmative defense to such

charges by proof of his or her compliance with the requirements provided in this chapter. *Any person meeting the requirements appropriate to his or her status under this chapter shall be considered to have engaged in activities permitted by this chapter and shall not be penalized in any manner, or denied any right or privilege, for such actions.*

(Emphasis added.)

¶20 An average lay voter reading this provision in context would not understand it to prohibit private employers from maintaining a drug-free workplace and terminating employees who use medical marijuana. The prohibition against "penaliz[ing] in any manner, or den[ying] any right or privilege" follows that provision's earlier limiting reference to those charged with violating a state criminal law relating to marijuana—that is, those charged and subject to criminal prosecution. Former RCW 69.51A.040(1). The average voter would interpret this language as restricting the State from imposing penalties ancillary to criminal prosecution.

¶21 Last, Roe argues that former RCW 69.51A.060(4) (1999)'s statement that "[n]othing in this chapter requires any accommodation of any medical use of marijuana in any place of employment" implies that employers must accommodate an employee's *offsite* use of medical marijuana. But when interpreting the language of a voter initiative, we do not read into the initiative " 'technical and debatable legal distinction[s]' " that are not apparent to the average informed lay voter. *Taxpayers*, 111 Wn.2d at 97-98 (alteration in original) (quoting *In re Estate of Hitchman*, 100 Wn.2d 464, 469, 670 P.2d 655 (1983)). Here, the average informed lay voter would not read this provision as creating a corollary duty for employers to accommodate an employee's medical use of marijuana *outside* the workplace where MUMA expressly creates no such duty *inside* the workplace. To the contrary, absent the strained construction Roe urges, the provision implies that MUMA will place no requirements on employers or places of employment. Moreover, it is unlikely that voters intended to create such a

sweeping change to current employment practices, as Roe suggests, through a negative implication, when prior statutes imposing duties on private employers have done so only with explicit language. *See* RCW 49.17.160(1) ("[n]o person shall discharge or in any manner discriminate against" employee for filing a complaint under Washington Industrial Safety and Health Act of 1973, ch. 49.17 RCW); RCW 49.44.090(1) (it is "unfair practice" for employer to "refuse to hire or employ . . . or to terminate from employment" individual because she is 40 years of age or older); former RCW 49.60.180(1)-(3) (2006) (it is "unfair practice" for any employer to "refuse to hire," "discharge or bar . . . from employment," or "discriminate against . . . in compensation or in other terms or conditions of employment" individuals based on characteristics identified in chapter 49.60 RCW).

¶22 Thus, it is clear from a commonsense reading of MUMA's plain language that the voters did not intend to impose any duty on private employers to accommodate employee use of medical marijuana. When construing a statute, we must read it in its entirety, not piecemeal, and interpret the various provisions of the statute in light of one another. *Thorne*, 129 Wn.2d at 763. Because MUMA's language is unambiguous and does not support the creation of an implied cause of action, we need not look to extrinsic evidence of the voters' intent. *Taxpayers*, 111 Wn.2d at 98.

PUBLIC POLICY

¶23 Next, Roe argues that TeleTech terminated her employment in violation of Washington public policy as expressed in MUMA.

¶24 Under the common law, employers may generally terminate an at-will employee for any reason or for no reason at all. *Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 935, 913 P.2d 377 (1996). A narrow exception to the employment at-will doctrine prohibits an employer from discharging an employee for a reason that violates public

policy. *Sedlacek v. Hillis*, 145 Wn.2d 379, 385, 36 P.3d 1014 (2001). Roe must meet four elements to state a claim for wrongful termination in violation of public policy. Roe must prove that (1) the existence of a clear public policy (the clarity element) (2) discouraging the conduct in which she engaged would jeopardize the public policy (the jeopardy element), (3) the public-policy-linked conduct caused her dismissal (the causation element), and (4) TeleTech cannot offer an overriding justification for her dismissal (the absence of justification element). *See Wahl v. Dash Point Family Dental Clinic, Inc.*, 144 Wn. App. 34, 41-42, 181 P.3d 864 (2008).

¶25 Largely repeating her earlier interpretation of MUMA, Roe points only to the act itself as expressing a public policy against terminating an employee for the employee's at-home medical use of marijuana. But as we held above, MUMA's policy is to protect qualified patients and their physicians from state criminal prosecution. Thus, Roe cannot establish the clarity element necessary to support her wrongful termination in violation of public policy claim and it fails.

¶26 MUMA provides qualifying medical users only a defense to criminal prosecution. MUMA neither grants employment rights for qualifying users nor creates civil remedies for alleged violations of the act. The trial court's decision to award summary judgment in TeleTech's favor was proper, and we affirm.

HOUGHTON and HUNT, JJ., concur.

Review granted at 168 Wn.2d 1025 (2010).